Filed 5/16/22 (unmodified opinion attached)

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ROBERT RAMIREZ RAMOS,<br><br>    Defendant and Appellant. | F080916<br><br>(Super. Ct. No. VCF361905B)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[No Change in Judgment] |

**THE COURT:**

It is ordered that the partially published opinion filed herein on April 27, 2022, be modified as follows:

1.  On page 2, the sixth sentence in the second paragraph beginning "He saw the black car" is modified to read as follows:

> He saw the black car on the left side of his car and the back passenger window rolled down.

2.  On page 17, the fifth sentence in the second paragraph beginning "In addition, both predicate offenses" is deleted and the following sentences inserted in its place:

> In addition, the last of the predicate offenses must have "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed."  The predicate offenses must have been committed by gang "members," and must have been for the "common[] benefit[] [of] a criminal street gang."

3.  On page 20, the third sentence in the first paragraph beginning "Neither predicate offense" is modified to read as follows:

The last predicate offense did not occur within three years of the date the currently charged offense was committed—February 3, 2018—as required by amended section 186.22.

4. On page 20, the words of the first sentence of the second paragraph—"Excluding evidence of these offenses,"—are deleted and the word "Accordingly," inserted in their place.

Except for the modifications set forth, the opinion previously filed remains unchanged. There is no change in the judgment.

Respondent's petition for rehearing is denied.

PEÑA, Acting P. J.

WE CONCUR:

SMITH, J.

DE SANTOS, J.

2.

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ROBERT RAMIREZ RAMOS, <br><br> Defendant and Appellant. | F080916 <br><br> (Super. Ct. No. VCF361905B) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Robert K. Gezi, Darren Indermill, Lewis A. Martinez, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., III. and IV. of the Discussion.

# INTRODUCTION

While this appeal was pending, the Legislature enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which went into effect on January 1, 2022. Assembly Bill 333, in part, amended the language of Penal Code section 186.22 to modify the showing necessary to sustain a gang enhancement. (Undesignated statutory references are to the Penal Code.) It also added section 1109, which requires the bifurcation of the trial of gang enhancements from that of the underlying offense(s) upon a defendant's request. Among other issues, we consider whether these two changes in the law apply retroactively to this case. In the published portion of this opinion, we conclude both changes apply retroactively. Under the circumstances, however, only the amendment to section 186.22 requires reversal and remand.

Robert Ramirez Ramos and three codefendants—Francisco Nava, Steven Lopez, and Ruben Perez—engaged in a confrontation at a convenience market gas station with E.D. and his girlfriend, C.A. They yelled rival gang slurs at E.D., Lopez and Perez threw drinks into the car E.D. and C.A. were sitting in, and Lopez grabbed E.D.'s shirt and struck him in the back of the head, scratching his neck. Perez also tried to grab E.D. E.D. drove away. When E.D. stopped at an intersection, he saw a black car speeding toward him, heard two gunshots and glass breaking, and felt an impact on his car. He saw the black car on the left side of his car and a man pointing his hand out of the back passenger window. Video surveillance footage depicted Ramos as the person in the driver's seat of the black car at the gas station.

The four defendants were charged with multiple offenses in relation to the incident. At trial, the prosecution presented expert testimony on street gangs, evidence of the defendants' prior contacts with police, and certified records of convictions of Norteño gang members as proof of a pattern of gang activity to prove the street gang enhancements.

2.

The jury acquitted the four defendants of attempted murder of E.D. and C.A. (counts 1 and 2, respectively) and was deadlocked on the lesser included offenses of attempted voluntary manslaughter. The jury convicted all four defendants of shooting into an occupied motor vehicle in violation of section 246 (count 3) and found true allegations a principal used a firearm (§ 12022.53, subds. (c) & (e)(1)) and that the offense was committed for the benefit of a criminal street gang (former § 186.22, subd. (b)(1)(C)). The jury was deadlocked as to all four defendants on count 4, criminal street gang conspiracy in violation of section 182.5. (The jury convicted Lopez and Perez of battery in violation of section 242 in count 5 and found the offense was committed for the benefit of a criminal street gang (former § 186.22, subd. (b)(1)(C)).)

Ramos challenges his conviction for shooting at an occupied motor vehicle and the related firearm and gang enhancements on multiple grounds. First, he contends the court prejudicially erred in admitting evidence related to an uncharged offense requiring reversal of his conviction and the related enhancements. He also argues the court erred in imposing both the firearm enhancement and the gang enhancement even though it stayed the former. He further challenges the validity of the gang enhancement, firearm enhancement, and underlying conviction pursuant to Assembly Bill 333. Ramos asserts the changes enacted by Assembly Bill 333 are retroactive and, accordingly, his gang enhancement should be reversed and retried under the new requirements of section 186.22. He also asserts his conviction for shooting at an occupied motor vehicle must be reversed and retried in a bifurcated proceeding under newly enacted section 1109. Finally, Ramos challenges the imposition of a restitution fine and certain court assessments because the court failed to hold an ability to pay hearing.

As noted above, we agree Assembly Bill 333 applies retroactively and Ramos is entitled to reversal of his gang and firearm enhancements on that basis. However, we affirm Ramos's conviction for shooting at an occupied motor vehicle. Accordingly, we remand for further proceedings consistent with this opinion.

**FACTUAL BACKGROUND**

*February 3, 2018 Incident*

In the evening of February 3, 2018, E.D. was at a convenience market with his girlfriend C.A.; E.D. was wearing a navy blue shirt. They met E.D.'s parents for dinner. E.D. testified Ramos and his codefendant Nava approached E.D. when he was at the register checking out, though other evidence introduced suggested Ramos did not enter the store.[1] Nava said, "'What's up Ene?'" E.D. smiled and said "What's up?" E.D. walked out of the store toward his car; codefendants Lopez and Perez followed him and said, "'Fuck Sur trece.'" E.D. understood the statement to mean "disrespect toward the Southerner gang." E.D. testified all four defendants continued to shout disrespectful Southern gang slurs while E.D. and C.A. walked toward his car. E.D. and C.A. got in the car and reversed; E.D. saw Ramos and Nava talking to his mother as she was trying to get in her car. E.D. testified his car had a Los Angeles Dodgers logo decal on it; he and C.A. denied any gang involvement. E.D. rolled his window down halfway to tell the defendants he did not want any problems but, before he could, Lopez and Perez threw drinks into E.D.'s car. Lopez then grabbed and scratched E.D.'s neck; Perez tried to grab E.D., too. E.D. drove off. He saw Lopez and Perez running to their car, a black four-door sedan, as he left. He told C.A. to call 911 as he turned onto the road from the driveway. He could see the defendants' car in his rear view mirror as they exited from the same driveway.

E.D. got in the far right lane. The defendants pulled up behind E.D.'s car and then next to it. E.D. then heard glass breaking, tires screeching, and two gunshots; he felt the impact of a bullet on his car. E.D. and C.A. saw the rear passenger side window of the defendants' car rolled down. E.D. drove back to the convenience market and he and C.A.

---

[1]C.A. identified defendants Nava and Lopez as the individuals who approached E.D. inside the store and Perez and Ramos as the individuals who approached when they were outside the store. Officer Michael Elliot also testified the video surveillance footage did not depict Ramos entering the store at any time.

waited for the police.  Neither E.D. nor C.A. could identify Ramos in photographic line-ups following the incident.

The manager of the convenience market gave the police the surveillance videos from that day.  Officer Elliot identified Ramos, Perez, Nava, and Lopez in the video shown at trial.  He testified Ramos could be seen getting into the driver's seat of the car.

**Gang Expert Testimony**

Before trial, defendant Perez moved to bifurcate the gang allegations.  The court noted it would treat the objection as a joint challenge by all the defendants.  The court considered the motion and tentatively denied it because the gang allegations and underlying charges overlapped.  The prosecutor argued the gang evidence was intertwined with the charges, motive, and intent and substantive evidence of it would come in regarding the section 182.5 charge (count 4).  The court noted it intended to allow the gang expert to testify about the foundational components and opinions regarding the gang allegations and asked for comments from the parties; no objections or comments were made.  The court explained to the prosecutor that, with the *Sanchez* [*People v. Sanchez* (2016) 63 Cal.4th 665] issue, she was going to have to "prove … up individually … with witnesses."

Officer Joel Arjona, who was assigned to the Tulare Area Regional Gang Enforcement Team in February 2018, testified as a gang expert.  He discussed his experience working with gangs and how the Norteño and Sureño gangs are structured. He explained both gangs have symbols and signs used to reflect their affiliation.  Norteño gang members associate with the number 14 and the color red.  They use the Huelga bird as a symbol of the gang.  Sureño members use the color blue to represent the gang and associate with the number 13.  Arjona explained the Norteño gang derives from the prison gang Nuestra Familia.  He also explained local street gang members of the Norteño gang report to an individual called a "channel."  The "channel" then reports up to a member of Nuestra Familia who is in charge of the county.  He testified Norteño

5.

members pay "taxes" that are used for the benefit of the gang. He explained the Norteño gang has different cliques or subsets that all identify with the color red and the number 14. Members of different subsets work together, communicate with one another, commit crimes together, and share information and weapons. He discussed the subset North Side Visa Boys (or NSVB) and explained the symbols and tattoos they use to identify themselves. He stated all NSVB members are in Tulare County.

He testified to what he deemed to be "primary activities of the Norteño gang" based on his investigations and reports and from speaking with other officers and gang members. The primary activities are a lot of crimes, 33 of which the Penal Code considers "gang crimes." The list of gang crimes includes, but is not limited to, auto theft, possession of firearms, murder, attempted murder, assault, assault with deadly weapons, kidnappings, burglary, and vandalism.

Officer Arjona testified regarding two specific predicate crimes. He discussed the murder of John Hernandez committed by Norteño gang members Jacob Robles and Julian Gonzalez at the direction of Joe Dominguez, another gang member, on May 19, 2010. Officer Arjona was familiar with the case through his research. Counsel for defendant Nava objected on "foundation" grounds when the prosecutor asked whether Officer Arjona had an opinion as to whether the murder fits "the pattern of Norteño street gang activity … in Tulare County." The court overruled the objection. Based on his training and experience, speaking with other officers, and reading reports, Officer Arjona testified he believed gang member Joe Dominquez directed the two other gang members to kill the victim, who was a gang dropout. The prosecutor then introduced a certified copy of the murder conviction from that case, *People v. Julian Gonzalez*, No. VCF241993, conviction date May 15, 2012.

Officer Arjona then testified regarding an attempted murder that occurred at the Visalia Mall on January 27, 2012, by Adrian Esquer and Anthony Hanson. Arjona was not on duty at the time, but he researched the incident after the fact and "it was a gang

crime." Based on his conversations with the primary detective, study of the case, and review of the contacts of the suspects involved, he concluded the individuals involved were "gang members and that this was an intimidation shooting against a rival gang member. And a person who was caught in crossfire was also struck." He further opined the offense fits within the pattern of Norteño street gang activity in Tulare County. The People then introduced the certified conviction packet for *People v. Adrian Esquer*, No. VCF263049B for convictions of attempted murder and assault with a firearm, conviction date of January 31, 2014.

Arjona testified he reviewed approximately seven contacts law enforcement had with Ramos. He testified regarding the significance of the circumstances, clothing and paraphernalia during each incident and their relevance to the gang inquiry. Based upon his evaluation of set gang criteria, Officer Arjona testified, based upon his knowledge, training, experience, and investigation of the case, he believed Ramos was a Norteño gang member on February 3, 2018, when the shooting at E.D. and C.A. occurred.

***Prior Contacts***

On March 5, 2010, Officer Joshua Pena conducted a field interview with Ramos. Ramos was wearing a Raiders shirt and a red cross necklace associated with Norteño gang members in Visalia. He had a photograph of himself on his cell phone making gang signs. Police conducted a probation search of his bedroom. They found a CD showing a huelga bird, a pencil drawing of "1 NSVB 4," and a red bandana known to be associated with the Norteño gang.

On May 24, 2011, Officer Arjona responded to a call regarding a disturbance. He encountered Ramos, who was wearing a black "TC" hat. Ramos identified himself as a Norteño.

On July 4, 2015, police conducted a traffic stop. Ramos was in a car with other Norteño gang members. He admitted he was an NSVB member. Ramos had multiple

7.

gang-related tattoos including "NSV" (for North Side Visa and/or North Side Visalia), two dice with the numbers 1 and 4 on them, and "TC."

On January 26, 2016, Officer Elliot testified he contacted Ramos during a traffic stop with known Norteño gang member Cixto Murillo. He documented Ramos's tattoos, including "TC" on his hand, "Boyz" on his stomach, "Visalia" and "NSV" on his back, and an "N" on the left side of his neck.

Officer Michael Lombardo served in the gang unit of the Visalia Police Department for two years. He contacted Ramos for the first time on July 22, 2016. Officer Lombardo saw Ramos with Norteño gang members Daniel Contreras (who associates with the North Side Varrio Locos), Arthur Villegas (who associates with the North Side Varrio Locos), and Edgar Figueroa on a street corner drinking beer. Ramos gave Officer Lombardo a false name. Officer Lombardo went back to confront him and Ramos admitted he lied.

On November 19, 2016, police encountered Ramos with 11 known Norteño gang members at his house.

On May 11, 2017, Visalia police officer Aaron Hutchason encountered Ramos during a probation search of his house after a stolen cell phone was tracked there. Hutchason conducted a field interview with Ramos during which he documented Ramos's tattoos, including "V Boyz" on his forearm, "TC" on his right hand, "CA" on his left hand, "NS" above "Visalia" on his chest, a "14" on his chest, "Boyz" on his stomach, "NSV" on his back, "Ene" on the back of his head, a "V" and a "B" on each shin, and "Visalia" and "Boyz" on his back. He asked Ramos about his gang affiliation. Ramos reported he was a Norteño gang member who belonged to the North Side Visa Boyz subset and his nickname or moniker was "Little Rue."

The People also introduced testimony about the other codefendants' prior contacts with law enforcement, focusing on incidents that had gang-related circumstances.

8.

*Verdict and Sentencing*

The jury acquitted all four defendants of attempted murder of E.D. and C.A. (counts 1 and 2, respectively) and was deadlocked on the lesser included offense of attempted voluntary manslaughter. The jury convicted all four defendants of shooting into an occupied motor vehicle in violation of section 246 (count 3) and found true allegations a principal used a firearm (§ 12022.53, subds. (c) & (e)(1)) and that the offense was committed for the benefit of a criminal street gang (former § 186.22, subd. (b)(1)(C)). The jury was deadlocked as to all four defendants on count 4, criminal street gang conspiracy in violation of section 182.5.

The jury convicted Lopez and Perez of battery in violation of section 242 in count 5 and found the offense was committed for the benefit of a criminal street gang (former § 186.22, subd. (b)(1)(C)). The jury convicted Lopez of possession of a firearm by a convicted felon in violation of section 29800, subdivision (a)(1) (count 6).

On January 23, 2020, the court held a sentencing hearing on two cases involving Ramos, including the current case. The court sentenced Ramos to 15 years to life in prison for count 3 in this case pursuant to former section 186.22, subdivision (b)(4)(B). Ramos was ordered to pay a $5,000 restitution fine, $40 operations assessment, and a $30 criminal conviction assessment.[2] Ramos did not object to the imposition of the fines and fees.

## DISCUSSION

**I. The Trial Court Did Not Prejudicially Err in Admitting Evidence of Ramos's Prior Bad Acts[*]**

Ramos challenges the admission of evidence of his uncharged conduct as irrelevant and more prejudicial than probative. For the reasons that follow, we cannot

---

[2]After the court sentenced Ramos on the second case, it noted it found "no ability to pay attorney's fees."

[*]See *ante*, page 1.

9.

conclude the court abused its discretion in permitting limited evidence of a 2009 incident or that Ramos was prejudiced as a result.

## A.    Relevant Procedural History

Before trial, the court held the prosecutor could impeach Ramos with a 2016 conviction for a felony violation of section 273.5 for willful infliction of corporal injury. However, the court noted the prosecutor could not ask if it was a crime of moral turpitude; rather, the prosecutor was limited to bringing out the fact Ramos had a felony conviction from 2016.

During trial, Officer Arjona testified regarding his prior contacts with the defendants. He explained he had known Ramos for 11 to 12 years, since Ramos was 11 or 12 years old. Officer Arjona testified that on November 3, 2009, he was dispatched to a fight in progress. When he arrived, an individual named Alex G. was lying on the ground in the street and his face was injured. Alex G. was upset and flustered; he had been assaulted by three males and appeared relieved to see Officer Arjona. Alex G. reported he was pushed down to the ground; one person kicked him in the face.

Ramos's counsel objected and moved to strike all of Arjona's testimony pursuant to Evidence Code section 352, arguing, "It is prejudicial. No identification has been provided. It is a statement from the victim being allowed in." The court agreed with Ramos's counsel at that point and granted his motion to strike.

Arjona then testified his investigation into the incident involving Alex G. led him to contact Ramos. He arrested Ramos. After Ramos was advised of his *Miranda* rights, he admitted he and two others, Patrick B. and Andres R., assaulted the victim and took his iPod.

At that point in the testimony, Ramos's counsel asked to approach the bench. The court excused the jury. Ramos's counsel then objected to the entire line of questioning, arguing it was inadmissible character evidence:

> "There's no indication of [Evidence Code section] 1101(b) regarding my client that there was a 211 [robbery], a 275.5 [*sic*]. The Court sanitized if

10.

that was going to come in as to my client.  We're now talking about a ten-year old event when my client was 13 or 14 years old, a 211 charge, and an assault.  What is the offer of proof?  If it is about a gang contact that he was associating with people, fine, but it seems as though it is being offered for [Evidence Code section] 1101(b), that my client is a violent individual.  I object to the entire line of questioning."

The prosecutor asserted the evidence was being offered to establish Ramos's gang association:

"It is being offered as a prior gang contact.  Defense counsel was put on notice of when it was included in the gang packet, as well as the People's motions in limine outlining all of the prior gang contacts.  This shows his association with the criminal street gang.

"If he testified further, Officer Arjona would testify he's familiar with the two other people and knows them to be Northern associates at the very least, as well as it shows a gang-related crime, which is also one of the criteria for establishing whether someone is a gang member.

"One step further, an actual element of … Section 182.5 requires that the defendant know that members of the Norteno gang engage in or have engaged in criminal activity.  Surely, it would be direct evidence, if there ever was one, of [Ramos]'s knowledge as to this situation."

Defense counsel agreed evidence Ramos was associating with members of the street gang is "[f]ine," but the criminal activity "should be sanitized."  He argued the prosecutor was "getting into the actual facts of what happened here."  But "[i]t was already testified by Officer Arjona about a 211 and 245 occurring," so was "being offered for dual purposes."  He asserted the evidence was not being offered for "the gang," but rather as Evidence Code section 1101, subdivision (b) evidence "to say [Ramos] is violent and accused of a crime."  However, it was "ten years ago," and is prejudicial.

The court agreed with Ramos's counsel and held it would "exclude everything about the element of the crime except for the gang contacts."  Pursuant to Ramos's counsel's request, the court agreed to admonish the jury.  Accordingly, it advised:

"Ladies and gentlemen, we have had a discussion about the testimony we just received.  I'm going to give you a limiting instruction, which means that the evidence you just heard by this officer about the Defendant Ramos can only be considered by you in establishing a contact associated—well,

11.

with Defendant Ramos's association with the criminal street gang. For that limited purpose only."

Officer Arjona then testified he was familiar with Patrick B. and Andres R. Patrick B. was a Norteño gang member and Andres R. associated with Northern gang members.

The court later instructed the jury, "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and no other." It further instructed the jury that it may not conclude from the gang evidence "that [Ramos] is a person of bad character or that he has a disposition to commit a crime."

### B.    Standard of Review and Applicable Law

Evidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts. (Evid. Code, § 1101.) Evidence Code section 1101, subdivision (a) states the general rule that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

Evidence Code section 1101, subdivision (b), however, authorizes the admission of evidence that "a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." (*Ibid*.)

"[T]o be admitted, evidence of other crimes must be relevant to some material fact at issue, must have a tendency to prove that fact, and must not contravene other policies limiting admission, such as those contained in Evidence Code section 352." (*People v. Thompson* (1988) 45 Cal.3d 86, 109.) Evidence Code section 352 affords the trial court

12.

discretion to exclude such evidence if its probative value is "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid*.)

A trial court's rulings under Evidence Code sections 1101 and 352 are reviewed for abuse of discretion. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.)

## C. Analysis

Ramos asserts "the prior attack stood alone as the only evidence that [he] or any of the other three defendants had previously been involved in a group attack." He asserts evidence of the prior attack was inadmissible character evidence subject to exclusion as "extremely remote" and "unduly prejudicial and cumulative to less prejudicial evidence of his gang membership." Ramos acknowledges the court gave the jury a limiting instruction but he contends the instruction "was insufficient to dispel the prejudice from the highly inflammatory evidence." He asserts "the jury was bound to conclude that, if [he] was involved in a previous, violent group attack, then he was the type of person who would have knowingly aided and abetted in the charged shooting." He argues the admission of such evidence violated his constitutional right to due process, and it was not harmless beyond a reasonable doubt. He also contends, absent the erroneous admission of such evidence, it was reasonably probable he would have obtained a better result. The People assert Ramos's contention is forfeited because, though his counsel objected to the evidence, he did not move for a mistrial. They further contend the evidence was properly admitted and not prejudicial, particularly since the jury acquitted Ramos of the attempted murder counts and conspiracy charge. We cannot conclude the court abused its discretion in admitting limited evidence of the 2009 incident or that Ramos was prejudiced as a result.[3]

---

[3]Because we reject this claim on the merits, we need not address the People's contention Ramos's point of error is forfeited because his counsel failed to move for a mistrial, citing *People v. Reeder* (1978) 82 Cal.App.3d 543.

Here, the proffered evidence that the court held was admissible—evidence of Ramos's documented association with two other Norteño gang members in 2009—was relevant to prove Ramos's gang affiliation. This was a disputed issue at trial that was material to the charged crimes that were alleged to be gang related. (See *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518 ["[I]t is proper to introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent"].) Because the uncharged conduct evidence was relevant to prove facts other than Ramos's disposition to commit criminal acts, it was admissible pursuant to Evidence Code section 1101, subdivision (b), subject to a section 352 analysis.

And we cannot conclude the probative value of such evidence was substantially outweighed by the probability its admission would necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury such that the court abused its discretion in admitting it. Here, the details of the uncharged offense, which were not unduly shocking or inflammatory, were held to be inadmissible and the court struck the challenged evidence. (See *People v. Samuels* (2005) 36 Cal.4th 96, 124 ["'We have described the "prejudice" referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues'"].) Additionally, the court instructed the jury on the limited purpose for which evidence of the prior incident was admitted, and we presume the jury followed that instruction. (See *People v. Orloff* (2016) 2 Cal.App.5th 947, 957.) "If defendant believed a more extensive instruction was needed, it was his burden to request one." (*People v. Chhuon* (2021) 11 Cal.5th 1, 33.)

Ramos argues the 2009 incident was "extremely remote" and cumulative.[4] In support, he relies upon *People v. Leon* (2008) 161 Cal.App.4th 149. In *Leon*, the

---

[4]We note Ramos did not object to the proffered evidence on the grounds that it was cumulative. Typically, a specific objection is required to preserve error, but because the California Supreme Court has analyzed the cumulative nature of Evidence Code section 1101,

defendant objected to the admission of evidence of a juvenile true finding for robbery he suffered in 1999, arguing it was prejudicial and cumulative. (*Id*. at p. 164.) The court admitted the evidence "for the purpose of establishing the predicate offenses necessary to establish the section 186.22, subdivision (b)(1) gang sentence enhancements and the gang membership elements charged in connection with counts 3 and 4." (*Id*. at p. 165.) On appeal, the *Leon* court concluded there was ample evidence apart from the defendant's 1999 juvenile offense to establish both the elements of a criminal street gang and that the defendant was a gang member. (*Id*. at p. 169.) Because of the "other overwhelming evidence establishing both of these facts," the *Leon* court concluded the trial court abused its discretion in admitting evidence of the uncharged offense. (*Ibid.*) However, the error was harmless in light of the considerable other evidence of the defendant's relationship with his codefendant and his intent. (*Id*. at p. 170.)

Even if the issue of Ramos's gang association was not reasonably subject to dispute such that the admitted evidence could be deemed cumulative, we conclude, as the *Leon* court did, Ramos was not prejudiced by its admission. (See *People v. Leon*, *supra*, 161 Cal.App.4th at p. 170.) Here, like in *Leon*, there was extensive evidence of Ramos's gang association and strong evidence of his intent to aid and abet the shooting. There was evidence Ramos drove the car from which the shots emanated. As the driver, he followed the victims' car and positioned his car next to it, permitting the passenger to

subdivision (b) evidence when weighing prejudice in a section 352 analysis, we assume for purposes of our analysis Ramos's section 352 objection preserved error on this issue. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405–406 ["In many cases the prejudicial effect of [uncharged act] evidence [to demonstrate the existence of a common design or plan] would outweigh its probative value, because the evidence would be merely cumulative regarding an issue that was not reasonably subject to dispute"]; accord, Evid. Code, § 353 ["A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"]; *People v. Williams* (2008) 43 Cal.4th 584, 620 ["""[Q]uestions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal"""].)

shoot at the victims. We further note the jury acquitted Ramos of multiple charges, demonstrating they did not aggregate all the evidence to convict Ramos of all the charged crimes. Additionally, as discussed, the 2009 incident was not uniquely inflammatory, and the jury was instructed it should only consider it for a limited purpose. (See *People v. Franklin* (2016) 248 Cal.App.4th 938, 955 ["The California Supreme Court has consistently found vague and fleeting references to a defendant's past criminality to be curable by appropriate admonition to the jury"].) Indeed, the prior uncharged offense was less inflammatory than the charged offense, decreasing the possibility the jury's passions were inflamed by it. (See *People v. Case* (2018) 5 Cal.5th 1, 41 ["The danger of undue prejudice is … lessened if evidence of the uncharged acts was 'no more inflammatory than the testimony concerning the charged offenses'"]; accord, *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 825–826; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 205.) The jury was further instructed it should not consider the gang evidence as evidence Ramos is a person of bad character or that he had a disposition to commit a crime. Ramos has not shown the jury disregarded the instructions nor has he persuaded us the evidence was so inherently prejudicial as to render the curative instructions ineffective. For all these reasons, we cannot conclude it is reasonably probable Ramos would have obtained a more favorable verdict absent the presentation of such evidence. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II. Ramos Is Entitled to Reversal of His Gang Enhancement in Light of Assembly Bill 333

In supplemental briefing, Ramos argues the imposed criminal street gang enhancement must be reversed because of changes made to section 186.22 by the recent enactment of Assembly Bill 333. He also contends newly enacted section 1109 (pursuant to Assem. Bill 333) requires reversal and retrial of his conviction for shooting at an occupied vehicle in a bifurcated proceeding. We conclude Ramos is entitled to reversal of his gang enhancement, but we affirm his conviction for shooting at an occupied vehicle.

16.

## A. Assembly Bill 333

While Ramos's appeal was pending, the Legislature enacted Assembly Bill 333, the STEP Forward Act of 2021, which, in part, amends section 186.22 to provide new substantive and procedural requirements for imposing gang enhancements. The legislation went into effect on January 1, 2022.

First, Assembly Bill 333 amended the definition of a "'criminal street gang,'" requiring proof that the gang is an *organized* association, whose members *collectively* engage in, or have engaged in, a pattern of criminal activity (§ 186.22, subd. (f)). Next, the law created a stricter requirement for proof of "a pattern of criminal gang activity," which is necessary to prove that the group with which the defendant is associated is indeed a criminal street gang. (See § 186.22, subd. (e).) Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another. (See former § 186.22, subd. (e).) Under the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses. (§ 186.22, subd. (e)(2).) In addition, both predicate offenses must have been committed "within three years of the date the current offense is alleged to have been committed," by gang "members," and must have been for the "common[] benefit[] [of] a criminal street gang." (§ 186.22, subd. (e)(1).) Assembly Bill 333 also narrowed the list of offenses that may be used to establish a pattern of criminal gang activity (compare former § 186.22, subd. (e)(1)–(33) with § 186.22, subd. (e)(1)(A)–(Z)). Additionally, it defines "to benefit, promote, further, or assist" throughout section 186.22 to mean "to provide a common benefit to members of a gang where the common benefit is more than reputational." (*Id*., subd. (g).) The legislation notes examples of a common benefit that are more than reputational "may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (*Ibid*.)

17.

Finally, Assembly Bill 333 adds section 1109, which requires gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense.  (Stats. 2021, ch. 699, § 5.)  Section 1109 also requires the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)) to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.

**B.      The Amendments to Section 186.22 Apply Retroactively and Ramos Is Entitled to Reversal of His Gang Enhancement**

First, the parties agree Assembly Bill 333's amendments to section 186.22 altering the substantive requirements necessary to prove a gang enhancement operate retroactively.  Because the legislation increased the evidentiary burden necessary to prove a gang-related enhancement, we agree it was an ameliorative change in the law that applies retroactively to cases not yet final on appeal.

Ordinarily, "a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise."  (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287 (*Tapia*).)  However, in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), our Supreme Court recognized an exception to this rule.  The court explained that "[w]hen the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act.  It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.  The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final.  This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology."  (*Id*. at p. 745.)

18.

In subsequent years, the California Supreme Court has applied this doctrine broadly "to statutes changing the law to the benefit of defendants." (*Tapia*, *supra*, 53 Cal.3d at p. 301; see generally *People v. Frahs* (2020) 9 Cal.5th 618, 631–632 [pretrial diversion statute is retroactive because it provides possible benefit to class of criminal defendants, does not contain express savings clause, and Legislature did not signal its intent to overcome *Estrada* inference]; *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 309 ["Proposition 57 is an 'ameliorative change[] to the criminal law' that we infer the legislative body intended 'to extend as broadly as possible'"].)

Most relevant to this case, the Supreme Court in *Tapia* held the presumption of retroactivity applies to laws that change the substantive requirements for an enhancement in a defendant's favor. (See *Tapia*, *supra*, 53 Cal.3d at pp. 300–301.) In *Tapia*, the electorate had recently passed an initiative requiring proof of intent to kill for certain special circumstance allegations. (*Ibid.*) Because the initiative "redefine[d], to the benefit of defendants, conduct subject to criminal sanctions," the court held the initiative applied retroactively. (*Id.* at p. 301.)

Like in *Tapia*, because Assembly Bill 333's substantive changes to section 186.22 "redefine, to the benefit of defendants, conduct subject to criminal sanctions," these changes apply retroactively to all cases—like Ramos's—in which the judgment of conviction is not yet final. (*Tapia*, *supra*, 53 Cal.3d at p. 301; accord, *People v. Sek* (2022) 74 Cal.App.5th 657, 667 [concluding Assem. Bill 333's amendments to § 186.22 "'redefine[d], to the benefit of defendants, conduct subject to criminal sanctions' [citation], and it therefore applies retroactively under *Estrada*"]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478 [similar]; see *People v. Lopez* (2021) 73 Cal.App.5th 327, 344 [concluding substantive changes in Assem. Bill 333 apply retroactively because they "increase[] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement"]; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822 [same].)

And here, it is undisputed Ramos is entitled to reversal of the gang enhancement on this basis; that is, neither party argues, nor can we conclude, the evidence presented at trial was sufficient to sustain the gang enhancement under the revised requirements of section 186.22. At trial the prosecution introduced evidence of two cases committed in 2010 and 2012 as evidence of the predicate offenses necessary to establish a pattern of criminal gang activity. Neither predicate offense occurred within three years of the date the currently charged offense was committed—February 3, 2018—as required by amended section 186.22. (Stats. 2021, ch. 699, § 3.)

Excluding evidence of these offenses, the existing record is insufficient to support the heightened evidentiary requirements set forth by amended section 186.22 following the enactment of Assembly Bill 333. As a result, the criminal gang enhancement applied to Ramos's sentence must be reversed. However, the People are not foreclosed from retrying Ramos on the gang enhancement upon remand under the new requirements of amended section 186.22. Put differently, "'[b]ecause we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial.'" (*People v. Sek*, *supra*, 74 Cal.App.5th at p. 669; accord, *People v. Figueroa* (1993) 20 Cal.App.4th 65, 72 ["Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence"]; see *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand"].)

### C. Section 1109 Is Retroactive but Ramos Is Not Entitled to Reversal of His Underlying Conviction

Ramos also argues newly enacted section 1109 should apply retroactively to his case and requires reversal of his underlying conviction for shooting at an occupied vehicle. He asserts the new statute, which, in part, requires bifurcation of the trial on the

gang enhancement(s) from the trial on the underlying charge(s) upon a defendant's request, entitles him to a reversal and retrial of his underlying conviction. The People deny section 1109 should apply retroactively because it is a procedural rather than substantive change in the law. Irrespective, they contend Ramos is not entitled to reversal of this conviction because he was not prejudiced by the failure to bifurcate the gang enhancement. We agree with Ramos that section 1109 should apply retroactively but conclude he is not entitled to reversal of his conviction for shooting at an occupied vehicle because he was not harmed by the failure to bifurcate. Accordingly, we affirm this conviction.

As discussed, Assembly Bill 333 amends section 186.22 and creates section 1109. (Stats. 2021, ch. 699, §§ 3–5.) Pursuant to section 1109, subdivision (a), upon a defendant's request, a case in which a gang enhancement is charged under section 186.22, subdivision (b) or (d) must be tried in separate phases. Section 1109, subdivision (b) provides that "[i]f a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."

On its face, the legislation states, in part, that according to the Committee on Revision of the Penal Code's 2020 report, "Gang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people." (Stats. 2021, ch. 699, § 2, subd. (d)(6).) The legislation expressly declares:

> "(e) "California courts have long recognized how prejudicial gang evidence is. (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 193.) Studies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions. (Eisen, et al., Examining the Prejudicial Effects of Gang Evidence on Jurors (2013) 13 J. Forensic

21.

Psychol. Pract. 1; Eisen, et al., Probative or Prejudicial: Can Gang Evidence Trump Reasonable Doubt? (2014) 62 UCLA L.Rev. disc. 2; see also, 2020 Annual Report, p. 46 ['Studies show that even merely associating an accused person with a gang makes it more likely that a jury will convict them'].) The mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence.

"(f) Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact." (Stats. 2021, ch. 699, § 2, subds. (e), (f).)

Thus, by its plain language, Assembly Bill 333 is an ameliorative change to the criminal law intended to benefit a class of criminal defendants by reducing the potential harmful and prejudicial impact of gang evidence through bifurcation. The legislation is geared to address wrongful convictions and mitigate punishment resulting from the admission of irrelevant gang evidence at trial; accordingly, the logic of *Estrada* applies. (See *People v. Frahs*, *supra*, 9 Cal.5th at pp. 634–635; accord, *People v. Superior Court* (*Lara*), *supra*, 4 Cal.5th at p. 309 [*Estrada* inference of retroactivity applies to ameliorative change in criminal law].) And the Legislature did not include an express savings clause limiting Assembly Bill 333 to prospective-only application or clearly signal its intent for section 1109 to apply prospectively thereby overcoming the *Estrada* inference. (See *People v. Frahs*, *supra*, at p. 634 ["Our prior decisions have … made clear that in order to rebut *Estrada*'s inference of retroactivity concerning ameliorative statutes, the Legislature must 'demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it'"].) Because *Estrada*'s inference of retroactivity is not rebutted, we conclude section 1109 must apply retroactively to all cases not yet final on appeal. (See *Frahs*, at p. 631 [diversion statute is retroactive because it provides a possible benefit to a class of criminal defendants, does not contain an express savings clause, and Legislature did not signal its intent to overcome *Estrada* inference]; *People v. Superior Court* (*Lara*), *supra*, at p. 309 ["Proposition 57 is an 'ameliorative change[] to the criminal law' that we infer the legislative body intended 'to extend as broadly as possible'"]; cf. *People v Brown* (2012) 54 Cal.4th 314, 325 ["[A]

22.

statute increasing the rate at which prisoners may earn credits for good behavior does not represent a judgment about the needs of the criminal law with respect to a particular criminal offense, and thus does not support an analogous inference of retroactive intent"].)

The People, however, argue the changes instituted by section 1109 govern trial procedure and do not alter the substantive requirements of the gang allegations; accordingly, they apply prospectively only. In support, they cite our court's decision in *People v. Cervantes* (2020) 55 Cal.App.5th 927, 940.

We are not persuaded. In *Cervantes*, our court considered whether amendments made to section 859.5—which until then only required electronic recording of custodial interrogations of minors but was then amended to apply to custodial interrogations of adults—applied retroactively to render the defendant's confession inadmissible and, accordingly, entitled him to reversal of his convictions. (*People v. Cervantes*, *supra*, 55 Cal.App.5th at pp. 936–937.) We noted "our high court has declined to extend the reach of *Estrada* to legislative action that does not alter or reduce criminal punishment or treatment for past criminal conduct." (*Id.* at p. 939.) We held the amendments to the statute were not retroactive because they did not "alter the substantive requirements for conviction, nor affect the available punishments in the event of conviction." (*Cervantes*, at p. 940.) The changes also did not "alter or reduce criminal punishment or treatment." (*Ibid*.) Our court further held the logic of *Estrada* did not apply because "the amendments [at issue] were not designed to provide a clear and significant benefit to defendants; they were designed to reduce biased interpretation of, and ensure the accuracy of the evidence of, the communication that occurs in an interrogation."[5] (*Cervantes*, at p. 941.)

---

[5]Notably, in *Cervantes*, our court further explained the California Supreme Court did not hold procedural changes are subject only to prospective application in *Tapia*, *supra*, 53 Cal.3d 282. (*People v. Cervantes*, *supra*, 55 Cal.App.5th at p. 940, fn. 8.) Rather, the *Tapia* court held statutory changes affecting the conduct of a trial that had not yet taken place did not involve a question of retroactivity. (*Tapia*, at p. 288.)

In this regard, *Cervantes* is distinguishable. As discussed, by its express language, Assembly Bill 333 shows an intent by the Legislature to benefit a certain class of criminal defendants by reducing the potentially harmful and prejudicial impact of gang evidence through bifurcation of gang allegations. Thus, here, unlike in *Cervantes*, the logic of *Estrada* does apply.

The People also cite *People v. Sandee* (2017) 15 Cal.App.5th 294 in support of their argument. In that case, the Fourth Appellate District, Division One, held the passage of the Electronic Communications Privacy Act (§ 1546 et seq.) related to the prohibition of governmental searches of cellular phones (subject to exceptions), was not retroactive because it did not mitigate the penalty for a crime, decriminalize conduct altogether, or expand defenses. (*People v. Sandee*, *supra*, 15 Cal.App.5th at p. 305, fn. 7.) Accordingly, the *Estrada* presumption did not apply.

Again, we conclude *Sandee* is distinguishable. Here, Assembly Bill 333 expressly reflects the Legislature's belief "[t]he mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence." (Stats. 2021, ch. 699, § 2, subd. (e).) Accordingly, it is apparent from the face of the legislation that it is aimed at mitigating wrongful punishment resulting from the admission of prejudicial and harmful gang evidence; thus, the *Estrada* presumption is implicated.[6]

Nevertheless, we affirm Ramos's conviction for shooting at an occupied vehicle because we cannot conclude he was prejudiced by the failure to bifurcate the gang enhancement from the trial on the underlying charges. That is, we cannot conclude it is

---

[6]The Sixth Appellate District also recently concluded section 1109 is retroactive under *Estrada*, reasoning in part the new statute increases the possibility of acquittal—which necessarily reduces possible punishment. (See *People v. Burgos* (Apr. 15, 2022; H045212) __ Cal.App.5th __ [2022 Cal.App. LEXIS 317 at *27–*30].) The *Burgos* court concluded, under the facts of that case, the error was prejudicial. (*Id*. at p. __ [2022 Cal.App. LEXIS 317 at *32– 33].) Accordingly, the *Burgos* defendants were entitled to reversal of their underlying convictions based on the failure to bifurcate the gang-related allegations. (*Id*. at p. __ [2022 Cal.App. LEXIS 317 at *33].)

reasonably probable Ramos would have obtained a more favorable verdict in the absence of the gang evidence that would not have been presented had the gang enhancement been bifurcated.[7]  (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

Any inference of prejudice resulting from the gang evidence is dispelled by the fact the jury acquitted all the defendants of attempted murder and could not reach a verdict on the attempted voluntary manslaughter charges.  It is apparent from this record the jury did not simply rely on the gang evidence to convict the defendants of the charged crimes.  And the evidence Ramos aided and abetted the crime was strong.  As Ramos concedes in his briefing, the evidence was uncontroverted that he was the driver of the defendants' vehicle from which the gunman shot.  Though he challenges whether the evidence established he had the requisite intent for conviction of shooting at an occupied vehicle as an aider and abettor, the evidence reflected that, as the driver, Ramos actively pursued the victims' vehicle and positioned the defendants' car next to the victims' car before the shooting occurred.  Furthermore, nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges.  And here, some of the gang evidence was relevant to motive in that the defendants yelled derogatory gang terms at the victim to suggest they associated him with a rival gang, thereby injecting gang implications into the crimes.  Thus, it is likely some, though not all, of the evidence of Ramos's gang membership and the gang rivalry would have come in at a trial on just the substantive offenses.  (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049–1050 ["To the extent evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 ["evidence related to gang membership is

---

[7]We apply the *Watson* standard in reviewing for prejudice because Ramos does not argue, nor can we conclude, the failure to bifurcate the gang enhancement from the trial on the substantive charges violated his federal constitutional right to due process such that it rendered his trial fundamentally unfair.

not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative"]; but see *People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049 ["The predicate offenses offered to establish a 'pattern of criminal gang activity' (§ 186.22, subd. (e)) need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation.  Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt"].)  Additionally, the jury was given a limiting instruction regarding its consideration of the gang evidence, which we presume it followed.  (See *People v. Franklin*, *supra*, 248 Cal.App.4th at p. 953 ["We presume that the jury followed these limiting instructions [regarding considering gang evidence for a limited purpose], and there is nothing in this record to rebut that presumption"].)

On this record, we conclude Ramos was not prejudiced by the failure to bifurcate the gang enhancement allegation.  (See *People v. Hernandez*, *supra*, 33 Cal.4th at p. 1051 ["Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt"].)  Thus, we affirm Ramos's conviction for shooting at an occupied vehicle.  (See *People v. E.H.*, *supra*, 75 Cal.App.5th at p. 480 [failure to bifurcate was harmless under *Watson* standard in light of "overwhelming" evidence in support of robbery convictions, stating "[e]ven if section 1109 applied retroactively to his case—an issue we need not and do not decide here— E.H. cannot show it is 'reasonably probable' he would have obtained a more favorable result if his trial had been bifurcated"].)

**III.    Ramos's Firearm Enhancement Must be Reversed**[*]

In supplemental briefing, Ramos argues the court should have struck instead of stayed the section 12022.53 gang-related firearm enhancement.  We conclude this gang-related enhancement must also be reversed in light of our reversal of the section 186.22, subdivision (b) enhancement.

**A.    Standard of Review and Applicable Law**

Section 12022.53 provides for sentence enhancements for persons convicted of certain enumerated felonies who use a firearm during the commission of the crime.  A violation of section 246 is not one of the felonies enumerated in subdivision (a) of section 12022.53.  However, a section 12022.53 enhancement may apply under subdivision (a)(17) of the statute, where the penalty has been elevated to a life term through application of an alternate penalty provision.  (*People v. Jones* (2009) 47 Cal.4th 566, 569, 579; accord, *People v. Brookfield* (2009) 47 Cal.4th 583, 590–591.)

Section 12022.53, subdivision (e)(1) extends liability to aiders and abettors where "the prosecution has both 'pled and proved' that the defendant committed a felony on behalf of a street gang (see … § 186.22) and that a 'principal in the offense committed any act specified in subdivision (b), (c), or (d)'—that is, an act that would trigger a firearm enhancement had the defendant committed that act personally. (§ 12022.53(e)(1).)"  (*People v. Anderson* (2020) 9 Cal.5th 946, 953.)  Section 12022.53, subdivision (e)(2) states:

> "An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with section 186.20) of Title 7 of Part 1 shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense."

In *Brookfield*, the California Supreme court held "the trial court may not impose the sentence enhancement under section 12022.53 *in addition to* a life term under section

---

[*]See footnote, *ante*, page 1.

186.22(b)(4)." (*People v. Brookfield*, *supra*, 47 Cal.4th at p. 592.) Rather, a defendant who was an accomplice to a gang-related offense specified in section 12022.53 in which, as here, not the defendant but another principal personally used or discharged a firearm is "subject to additional punishment under *either* section 12022.53 *or* the gang-related sentence increases under section 186.22, but not *both*." (*Brookfield*, at p. 594.) The *Brookfield* court relied upon section 12022.53, subdivision (j) in determining the trial court should have imposed the greater penalty (the life term under § 186.22, subd. (b)(4)), rather than the lesser punishment (the 10-year sentence enhancement under § 12022.53, subds. (b) & (e)(1)). (*Brookfield*, at p. 596.) The provision states in part: "When an enhancement specified in this section has been admitted or found to be true, the court shall impose punishment for that enhancement pursuant to this section rather than imposing punishment authorized under any other provision of law, *unless another enhancement provides for a greater penalty or a longer term of imprisonment.*" (§ 12022.53, subd. (j), italics added.) Because the *Brookfield* court held the trial court erred in sentencing the defendant to both the life term under section 186.22, subdivision (b)(4) and the 10-year sentence enhancement under subdivisions (b) and (e)(1) of section 12022.53, it affirmed the decision of the Court of Appeal striking the 10-year sentence enhancement. (*Brookfield*, at p. 597.)

In *People v. Gonzalez* (2008) 43 Cal.4th 1118, the California Supreme Court concluded the word "impose" used throughout section 12022.53 "must be interpreted as shorthand for 'impose and then execute' to make sense." (*Gonzalez*, at p. 1127.) The *Gonzalez* court rejected an interpretation of section 12022.53, subdivision (f)—which prohibits the imposition of enhancements pursuant to certain other sections in addition to an enhancement imposed pursuant to that section—"that would have the trial court strike, rather than stay, the prohibited firearm enhancements." (*Gonzalez*, at p. 1127.) The court explained, this is "because the rules of statutory construction mandate that we interpret the statute in a manner that does not create unnecessary disharmony between

28.

subdivision (f) and subdivision (h) of section 12022.53," which previously prohibited a court from striking an allegation under that section. (*Id*. at pp. 1127–1128.) The *Gonzalez* court noted, requiring a court to strike rather than stay the prohibited enhancements would "mak[e] it more difficult, if not impossible, to impose and execute the term of imprisonment for an initially prohibited firearm enhancement in the event the section 12022.53 enhancement with the longest term of imprisonment is invalidated on appeal." (*Id*. at p. 1128.)

## B.    Analysis

In supplemental briefing, Ramos argues the court erred, pursuant to section 12022.53, subdivision (e)(2), in imposing and staying the firearm enhancement. He argues this section prohibits the imposition of both the firearm enhancement and a gang enhancement unless the defendant is the actual shooter. The People respond the trial court did not err in imposing and staying the firearm enhancement, but they agree Ramos is entitled to reversal of this enhancement in light of the passage of Assembly Bill 333. They further contend the prosecution should be afforded an opportunity to retry this gang-related enhancement. We conclude Ramos is entitled to reversal of this enhancement under Assembly Bill 333.

We have already concluded Ramos's gang enhancement imposed pursuant to former section 186.22 must be reversed. Because the imposed section 12022.53, subdivision (a)(17) enhancement applied to Ramos only because his penalty had been elevated to a life term through application of the alternate penalty provision provided for in former section 186.22, the section 12022.53 enhancement is no longer supported. Accordingly, the imposed firearm enhancement must be vacated. On remand, the prosecution may also seek to retry this gang-related enhancement. Because we strike the enhancement on other grounds, we do not address Ramos's arguments further.

## IV. Ramos May Raise His Challenge to the Imposed Restitution Fine and Court Assessments at Resentencing[*]

Ramos next argues the court violated his due process rights by imposing a $5,000 restitution fine (Pen. Code, § 1202.4), $40 court operations assessment (Pen. Code, § 1465.8), and a $30 criminal conviction assessment (Gov. Code, § 70373) without first determining whether he had the ability to pay these amounts. Ramos's due process argument is based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was decided after Ramos was sentenced and while his current appeal was pending. *Dueñas* held that "[d]ue process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes" certain assessments and "the execution of any restitution fine imposed under [section 1202.4] must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Id.* at p. 1164; accord, *People v. Castellano* (2019) 33 Cal.App.5th 485, 488–489.) Relying on *Dueñas*, Ramos asserts the fees must be vacated and the fines must be stayed, and the matter remanded for the trial court to determine his ability to pay. He also argues the restitution fine imposed under section 1202.4 violates his state and federal constitutional rights against excessive fines.

Ramos concedes he did not raise his challenges below, but he argues our court can consider the issue for the first time on appeal because the imposition of a restitution fine without an ability to pay determination violates due process and was in excess of the trial court's jurisdiction, resulting in an unauthorized sentence. He asserts under *Dueñas*, imposition of the restitution fine without an ability to pay finding violated due process, equal protection, and the right to be free from excessive fines, which are fundamental constitutional rights not subject to traditional forfeiture rules.

---

[*]See footnote, *ante*, page 1.

Because reversal of Ramos's gang enhancement requires a remand to the trial court, we need not address his challenge to the imposition of the restitution fine and court assessments without an ability to pay hearing.  Rather, on remand, Ramos may raise the argument during resentencing if he chooses to do so.

## DISPOSITION

The section 186.22, subdivision (b) gang enhancement and the section 12022.53 firearm enhancement are reversed.  The matter is remanded to the trial court for further proceedings.  The People shall have 60 days from the date of the remittitur in which to file an election to retry Ramos on these enhancements.  If the People elect not to retry him, the trial court shall modify the judgment by striking the enhancements and shall resentence Ramos accordingly.  Following the conclusion of proceedings, the court shall amend the abstract of judgment in a manner consistent with this disposition and forward copies of the amended abstract to the appropriate law enforcement and custodial officials.  In all other respects, the judgment is affirmed.


PEÑA, Acting P. J.

WE CONCUR:


SMITH, J.


DE SANTOS, J.